UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHSUETTS

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) | |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, | ) | |
| and LIBERTY MUTUAL PERSONAL | ) | |
| INSURANCE COMPANY | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | |
| | ) | |
| AFTERMATH SERVICES LLC and | ) | |
| AFTERMATH HOLDINGS LLC | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT AND JURY DEMAND**

Timothy W. Tapply
ttapply@brandtapply.com
Shahan J. Kapitanyan
skapitanyan@brandtapply.com
Brand & Tapply LLC
555 Washington Street, Suite 6
Wellesley, MA 02482
Phone: 781-431-7878
Fax: 781-431-7844

1

## <u>**TABLE OF CONTENTS**</u>

I.      INTRODUCTION

II.     PARTIES

III.    JURISDICTION AND VENUE

IV.     IMPACT OF DEFENDANTS' CONDUCT ON LIBERTY MUTUAL

V.      UNFAIR AND DECEPTIVE PRACTICES

      a.  Delayed Reporting of Claims to Foreclose Liberty Mutual's Rights

      b.  Unlawful and Fraudulent Billing for Equipment and Supplies

      c.  Unlawful and Fraudulent Billing for Chemicals

      d.  Unlawful and Fraudulent Double Billing for Work

      e.  Unlawful and Fraudulent Billing for Services of Unskilled Staff

VI.     SPECIFIC INSTANCES OF FRAUD

      a.  Liberty Mutual Insured:       D.C.
          Liberty Mutual Claim No.:   046994265
          Date of Loss:                      September 20, 2021

      b.  Liberty Mutual Insured:       J.G.
          Liberty Mutual Claim No.:   044972139
          Date of Loss:                      March 4, 2021

      c.  Liberty Mutual Insured:       J.G.
          Liberty Mutual Claim No.:   046744998
          Date of Loss:                      August 26, 2021

      d.  Liberty Mutual Insured:       A.A.
          Liberty Mutual Claim No.:   048700219
          Date of Loss:                      March 3, 2022

      e.  Liberty Mutual Insured:       R.R.
          Liberty Mutual Claim No.:   047720305
          Date of Loss:                      November 28, 2021

VII.    CAUSES OF ACTION

a.  COUNT I:      VIOLATION OF 18 U.S.C. § 1962(c)

b.  COUNT II:     UNJUST ENRICHMENT

c.  COUNT III:    COMMON LAW FRAUD

d.  COUNT IV:     UNFAIR OR DECEPTIVE TRADE PRACTICES

e.  COUNT V:      TORTIOUS INTERFERENCE WITH A BUSINESS

    RELATIONSHIP

f.  COUNT VI:     CONVERSION

g.  COUNT VII:    DECLARATORY RELIEF UNDER 28 U.S.C. § 2201

VIII.   JURY DEMAND

## COMPLAINT AND JURY DEMAND

Now come the Plaintiffs, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, and Liberty Mutual Personal Insurance Company (collectively referenced as "Liberty Mutual"), by their attorneys, and allege as follows:

### I.      INTRODUCTION

1.  This action seeks to terminate an ongoing fraudulent scheme perpetrated by Aftermath Services LLC and Aftermath Holdings LLC (collectively referenced as "Aftermath") against Liberty Mutual, and more broadly, against the insurance industry and unsuspecting family members, friends, and close contacts of loved ones who have passed ("contracting parties").

2.  Furthermore, the action seeks to recover more than $8,500,000.00 that Aftermath has wrongfully obtained from Liberty Mutual through the submission of hundreds of fraudulent and unlawful claims, using invoices seeking reimbursement for phony, unnecessary, and deceptive charges levied in the cleanup or remediation of various biohazard losses, including unattended deaths, crime scenes, suicides, and other losses of human life which result in blood, body fluids, and other biological substances.

3.  The scheme targets families in their most vulnerable and darkest moments shortly after the discovery of the death of their loved ones in traumatizing and debasing conditions.

4.  Knowing that individuals in the targeted group would be susceptible to being taken advantage of, Aftermath intentionally deceived them, committing acts in furtherance of the object and purpose of the scheme.

5.  Conceding that *some* amount of these cleanup services is legitimately completed in the insured structures, the final invoices from Aftermath, submitted to Liberty Mutual, contain fraudulent, inflated, and illusory charges.

6.  Ultimately, Aftermath Services intended these charges to be passed directly from Aftermath to Liberty Mutual, through the use of illusory contracts signed by people who may or may not have been Liberty Mutual policyholders, purported representatives of the policyholder's estate, or people with no authority to enter into binding contracts on behalf of Liberty Mutual's deceased policyholder.

7.  As more fully described in this Complaint, a specific process was engineered by Aftermath to create overinflated and fraudulent charges, in furtherance of the scheme against Liberty Mutual, unsuspecting family members and friends of the policyholders, and the home insurance industry.

8.  All of the acts and omissions of Aftermath described throughout this Complaint were undertaken intentionally.

9.  In order to manufacture the large number of fraudulent invoices and remediation jobs necessary to financially benefit themselves, Aftermath trained and directed a network of employees to obtain insurance information and secure fully executed contracts from people signing Aftermath contracts through deceptive, unfair, and fraudulent means.

10. As discussed below, Aftermath at all relevant times has known that the charges levied within the invoices submitted, or caused to be submitted, to Liberty Mutual were fraudulent in that the charges:

    a.  Involved phony services and charges that were not necessary, reparative, or in some cases, actually performed;

b.  Were the result of illegal, deceptive, unfair, and manipulative conduct directed at people taking care of remediation or cleaning up of losses at Liberty Mutual insured properties;

c.  Violated the terms and conditions of the subject Liberty Mutual policies, under which they were purportedly submitted.

11. The chart annexed hereto as **Exhibit 1** sets forth a representative sample of 82 claims, which outline the details of the fraudulent and unlawful claims for remediation and cleanup services that Aftermath submitted, or caused to be submitted, to Liberty Mutual.

12. Aftermath's scheme dates back to at least January 2016 and has continued uninterrupted through the present day.

13. As a result of Aftermath's scheme, between January 2016 and December 2021, Liberty Mutual has incurred damages in the form of payments of more than $8,500,000.00, including $6,700,000.00 in damages incurred by Liberty Mutual Insurance Company, $1,300,000.00 in damages incurred by Liberty Mutual Fire Insurance Company, $400,000.00 in damages incurred by Liberty Mutual Personal Insurance Company.

14. The damages are ongoing as Liberty Mutual and its policyholders have suffered, and will continue to suffer damages which exceed the jurisdictional limits of all lower courts.

15. Liberty Mutual is continuing to review its Aftermath claim files, including more than 500 claims involving fraudulent and unlawful invoices for remediation and cleanup services that Aftermath submitted to Liberty Mutual, resulting in more than $8,500,000.00 in payments made to Aftermath.

16. Liberty hereby incorporates by reference the Affidavits of Bryan Fly, a Complex Investigator with Liberty Mutual's Special Investigations Unit, Frank Macchione, a

6

former Senior Special Investigator with Liberty Mutual's Special Investigations Unit, and the exhibits annexed thereto, for further evidence of Aftermath's fraudulent scene.  See **Exhibit 2,** Affidavits of Bryan Fly with associated attachments 1 – 3 and Frank Macchione.

17. In addition to money damages, Liberty Mutual seeks a declaration that it is not legally obligated to pay Aftermath for claims and invoices which have been submitted by Aftermath because the invoices were fraudulent, unlawful, and otherwise non-reimbursable in that they:

   a. Involved phony services and charges that were not necessary, reparative, or in some cases, actually performed;

   b. Were the product of illegal, deceptive, unfair, and manipulative conduct directed at people taking care of remediation or cleaning up of losses at Liberty Mutual insured properties;

   c. Violated the terms and conditions of the subject Liberty Mutual policies, under which they were purportedly submitted.

18. Furthermore, Liberty Mutual seeks exemplary damages in the form of treble damages pursuant to the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO Act"), and Massachusetts law concerning regulation of business practices for consumers protection, Massachusetts General Laws chapter 93A, section 11 as well as applicable attorney fees as available at law.

## II.    PARTIES

19. Liberty Mutual is a Massachusetts mutual holding company with its principal place of business at 175 Berkeley Street, Boston, MA 02116. Liberty Mutual is authorized to conduct business and to issue insurance policies in the state of Massachusetts.

20. Plaintiffs, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, and Liberty Mutual Personal Insurance Company (collectively "Liberty Mutual") are trade names used to distribute Liberty Mutual insurance products.

21. Other trade names which fall under the umbrella of Liberty Mutual include, but are not limited to, American Economy Insurance Company, American States, Consolidated Insurance Company, First National Insurance Company of America, General Insurance Company of America, Insurance Company of Illinois, Liberty Insurance Corporation, Liberty Lloyds of Texas Insurance Company, Liberty Mutual Mid Atlantic Company, LM Insurance Corporation, LM General Insurance Company, Montgomery Mutual Insurance Company, Safeco Insurance Company of America, SAFECO Insurance Company of Illinois, SAFECO Insurance Company of Indiana, Safeco Insurance Company of Oregon, The First Liberty Insurance Corporation, and Wausau General Insurance Company.

22. Plaintiffs share common resources and personnel for purposes of receiving communications from vendors and claimants, and for investigating and adjusting claims.

23. Each of the Plaintiffs was subjected to and the victim of the same unlawful practices by Aftermath.

24. Aftermath Services LLC is a Delaware limited liability company, organized on December 4, 2012, with its principal place of business in Aurora, Illinois, operating throughout the United States.

25. Aftermath Holdings LLC is a Delaware limited liability company, organized on January 23, 2013, with its principal place of business in Aurora, Illinois, operating throughout the United States

26. Aftermath Services LLC and Aftermath Holdings LLC are collectively referred to herein as "Aftermath".

27. Aftermath was organized on or about December 4, 2012. On information and belief, Aftermath advertises itself as a certified crime scene & biohazard cleanup service in public advertising.

28. Defendant Aftermath Services LLC is registered as a Foreign Limited Liability Company in Massachusetts, organized under the laws of Delaware, on December 18, 2012.

29. Defendant Aftermath Services LLC was also registered as a Foreign Limited Liability Company in Connecticut on December 17, 2012, in Pennsylvania and Ohio on December 18, 2012, and in Texas on December 19, 2012, all organized under the laws of Delaware.

30. Aftermath caused fraudulent invoices for biohazard remediation and cleanup to be submitted to Liberty Mutual and other property insurers.

31. Aftermath engaged in violations of 18 U.S.C. §1962(c) by conducting its fraudulent affairs through a pattern of racketeering activity and violations of the federal wire fraud statute.

32. Aftermath, through its fraudulent actions, has been unjustly enriched in collecting payments for its invoices.

33. Aftermath intentionally, substantially, and continuously engages in the above-referenced conduct by 1) sending communications to Liberty Mutual; 2) billing Liberty Mutual for services that Aftermath claims to have rendered to Liberty Mutual's policyholders and contracting parties; and 3) demanding benefits from Liberty Mutual under Massachusetts-law contracts of home insurance.

34. Aftermath has also engaged in similar conduct throughout the United States.

35. At all times relevant hereto, Aftermath rendered services in the Commonwealth of Massachusetts and committed fraudulent, unfair, and deceptive acts set forth in Liberty's Complaint, including but not limited to, the following claims identified in **Exhibit 1**:

    a.  K.H, Claim No.:  033437174, DOL: March 12, 2016;

    b.  J.R., Claim No.:  036543941, DOL: May 29, 2017;

    c.  R.B., Claim No.:  039368949, DOL:  March 2, 2019; and

    d.  R.D, Claim No.:  044848139, DOL: March 19, 2021.

## III.   JURISDICTION AND VENUE

36. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

37. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claim brought under 18 U.S.C. §§ 1961 *et seq.* (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

38. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

39. Venue is appropriate in the Boston Division of the United States District Court for the District of Massachusetts pursuant to, among other things, 18 U.S.C. § 1965(a).

## IV.  IMPACT OF DEFENDANT'S CONDUCT ON LIBERTY MUTUAL

40. Liberty Mutual insures thousands of homes nationwide and has been a major participant in the market for underwriting of home insurance for decades.

41. Liberty Mutual policies, in various forms across many states consistent with local laws, provide for reimbursement for services performed in biohazard remediation in homes made necessary by a loss. These policies allow for accurate, reasonable, and necessary charges and reimbursement for work performed in the insured homes, depending on the dwelling coverage limits.

42. Providers of these biohazard remediation and cleanup services can, and regularly do, provide bills and invoices to Liberty Mutual under applicable policies of insurance.

43. In a *legitimate* biohazard remediation claim, Liberty Mutual would be put on notice as soon as the loss is discovered and it is determined that cleanup or removal of materials is necessary in the home, affected by blood, body fluids, and other biological substances.

44. Liberty Mutual would also be put on notice *before* any demolition in the home was completed, including the tearing out of carpet, tile, drywall, and other affected materials in the home.

45. Liberty Mutual has established multiple means in order to facilitate a submission of a notice of loss. For example, an Insured can submit the notice of loss by telephone, email, or via the internet.

46. In working with its Insured policyholder, service vendors, and contractors in the home, Liberty Mutual routinely receives and pays bills and invoices for services completed in the home, including cleanup by Aftermath.

47. In reviewing the bills and invoices received via interstate transfers consisting of email communications, written correspondence, and electronic facsimile, Liberty Mutual will request additional documentation and information supporting performance of the remediation services via electronic mail or facsimile.

48. Liberty Mutual was billed by Aftermath for remediation services, which Aftermath represented to Liberty Mutual were reasonable and necessary in the home, billed at costs involving equipment charges, chemical charges, personnel charges at an hourly rate completed by trained and qualified professionals, and other necessary and legitimate fees.

49. The representations made by Aftermath in their endeavor to be paid for services were material.

50. Liberty Mutual justifiably and detrimentally relied on false and misleading documentation provided by Aftermath, causing it to pay unwarranted and unsupported sums in coverage and causing it to incur unwarranted costs in investigating the insurance claims for legitimacy.

51. As outlined in the 82 representative claims identified to date, Aftermath has directly demanded payment of at least $2,000,000.00 between January 2016 and December 2021, including more than $800,000.00 in the last three years, and more than $94,000.00 for work purportedly done on Liberty Mutual-insured property in the state of Massachusetts (**Exhibit 1**).

## V.     AFTERMATH'S UNFAIR AND DECEPTIVE PRACTICES

**a. Delayed Reporting of Claims to Foreclose Liberty Mutual's Rights**

52. It is Aftermath's regular business practice to delay a phone call, email or any other means of putting Liberty Mutual on notice that Aftermath personnel are at the insured property, have been requested to begin services by someone at the property, and/or have discussed contracts with the customer.

53. Aftermath also fails to notify Liberty Mutual when it enters into a contract to conduct services at Liberty Mutual's Insured Property.

54. As evidenced by Aftermath "Customer Approved Time Sheets" when compared to Liberty Mutual's claim notes commemorating the First Notice of Loss, Aftermath employees, at the direction of the Aftermath Supervisor, delay reporting losses and claims by one to two full days.

55. Aftermath employees will also intentionally wait to call Liberty Mutual after business hours, when the after-hours emergency claim line is in effect, to report a loss.

56. As outlined in **Exhibit 1** under the First Notice of Loss ("FNOL") data sections (Columns N – T) of the 82 sampled claims, 53 of the claims were reported one or more days after Aftermath's entrance onto the property. Of the 17 claims actually reported on the same day Aftermath arrived, 5 of those claims were reported after-hours.

57. This after-hours reporting of the First Notice of Loss ensures that an adjuster cannot be assigned immediately and thus will not have a chance to review the loss, claim, and potential coverage until hours to days later.

58. In these multiple days of delayed reporting, Aftermath continues to purportedly render services at the property, conducting remediation, conducting tear-down of materials in the home including floors, walls, and furniture, and running up their fraudulent charges.

59. Aftermath employees will work a combined total of 4 to 40 hours and bill the hourly rates to Liberty Mutual without notice of the claim.

60. Thereafter, Aftermath does not provide Liberty Mutual with the signed contract, any initial estimates, or any other documents hinting at the final cost of purported services in the Insured home until the job is complete and finished.

61. Liberty Mutual does not receive a copy of any estimates, projected invoices or costs, supply cost sheets, or final invoicing for services until after the work is fully completed and days or weeks have elapsed.

62. Aftermath's delay in reporting the first notice of loss extinguishes Liberty Mutual's ability to see the property prior to Aftermath conducting demolition, to document the condition of the home, and to undertake its own assessment of the measure of the damage, which prejudices Liberty Mutual's assessment of the claim.

63. Aftermath's delay also ensures that Aftermath is able to perform excessive, unnecessary, and unwarranted demolition of Liberty Mutual's insured properties unchecked and unchallenged by the insurance company.

64. In this context, Aftermath submitted virtually all of its fraudulent invoices _after_ it had begun the purported remediation services because Aftermath knew that 1) this time frame severely limited Liberty Mutual's ability to verify the claims; and 2) it forced Liberty Mutual to rely on the invoices and other purportedly supportive documents from Aftermath.

**b. Unlawful and Fraudulent Billing for Equipment and Supplies**

65. The following facts and figures have also been investigated and verified by Liberty Mutual employees, Bryan Fly and Frank Macchione (**Exhibit 2**).

66. Within its final invoices, Aftermath provides an "Equipment and Supply Detail" which purportedly outlines the charges for specific materials, supplies, chemicals, and protective equipment used at the properties.

67. The equipment reports are redundant and without proper explanation or substantiation.

68. In adjusting claims, Liberty Mutual uses Xactimate® which is a software system for estimating the industry standard costs for building damage, repair and rebuilding costs in residential and small commercial structures.

69. For example, Xactimate prices for air scrubber use are $80.00 for 24-hour period of run time; however, Aftermath bills per calendar day, resulting in a double charge for the same 24-hour period (**Exhibit 1**, Columns BC – BF).

70. This air scrubber $80.00 charge also factors in filters, for which Aftermath bills separately.

71. Aftermath charges between $3.93 and $6.82 each for simple red plastic bags which are used in the cleanup of biohazard materials (**Exhibit 1**, Columns EA – EC). Upon information and belief, a simple review of online results shows that these trash bags can be purchased in bulk and for far less than what Aftermath charges Liberty Mutual.

72. Aftermath charges $2.85 or $4.89 per single black garbage bag (**Exhibit 1**, Columns ED – EE). The same Husky 42 Gal. Contractor Bags (32-Count) could have been purchased at a public retailer for $25.00, or 78¢ each (https://www.homedepot.com/p/HUSKY-42-Gal-Heavy-Duty-Clean-Up-Bags-32-Count-HK42WC032B/100063659).

73. It is also notable that these charges have reliably increased over time as Aftermath's scheme developed.

74. Aftermath's charges for Personal Protective Equipment ("PPE") Suits used are subject to a similar inequitable and exploitive markup. Similar protective suits frequently sell for $7.68 a pair, while Aftermath has more recently billed these disposable suits at $98.63 (**Exhibit 1**, Columns CZ – DA).

75. Aftermath employs similar markups when compared to the industry standard of Xactimate for:

   a. ATP swabs (10x the cost) (**Exhibit 1**, Columns EH-EI),

   b. leather gloves ($2.68 actual vs. $15.40 billed) (**Exhibit 1**, Columns CT-CU),

   c. Y/B Neoprene Chemical resistant gloves ($2.12 actual vs. $11.79 billed) (**Exhibit 1**, Columns CP-CQ) and

   d. knee pads ($4.99 actual vs. $17.60 billed) (**Exhibit 1**, Columns DB-DC).

76. In addition, none of the supplies listed includes a manufacturer, model number, price per unit, or any other justification for the costs allocated to the insured.

77. Additional fraudulent charges presented to Liberty Mutual with no explanation, context, or support include the following:

   a. Weights and Measurements for Equipment   $65.00

   b. Weights and Measurements for Disinfection of Equipment  $48.50

   c. Special Equipment     $48.50 per job

   d. Overhead and Profit   10% of Invoice Subtotal

   e. Off-Site Demobilization      $375.00

   f. Truck Disinfection   $275.00

   g. Dispatch Fee   $475.00

   (**Exhibit 1**, Columns AM – BB and BM – BN).

78. Liberty Mutual has demanded explanation or justification for this potpourri of fees, yet never received same.

**c. Unlawful and Fraudulent Billing for Chemicals**

79. Contained in its invoices are also numerous charges for chemicals purportedly used in the remediation services completed by Aftermath and its employees; however, none of these supplies are inventoried, identified, or quantified, except in broad-strokes charges.

80. Along with every invoice, Aftermath provides a document called the "Requirements and Best Practices for Trauma Cleaning and Biohazard Removal Companies."

81. This document claims that Aftermath uses specifically designed chemicals formulated to serve the biohazard remediation industry, a claim which is patently false.

82. Additionally, the invoice indicates that a number of the chemicals Aftermath uses during cleanups are "proprietary." However, the EPA indicates that none of the chemicals Aftermath uses are registered to Aftermath.

83. The charges for these chemical supplies are extortionist, in addition to being unsupported.

84. Aftermath invoices a chemical called Biotic Disinfectant that is billed at $84.93 an ounce. This works out to $10,871.04 per gallon (**Exhibit 1**, Columns DO-DP).

85. The actual cost for Biotic Disinfectant is $19.67 per gallon, a markup of over 55,000%.

86. Aftermath invoices a chemical called Biotic Solvent at $49.27/bottle. This Biotic Solvent is actually a product identified as Husky 910, which costs only $2.99/bottle (**Exhibit 1**, Columns DM-DN).

87. Aftermath invoices a chemical called Biotic Odor Counteract at $53.66/bottle. This Biotic Odor Counteract is actually a product identified as Husky 603, which costs only $6.67/bottle (**Exhibit 1**, Columns DK-DL).

88. Aftermath invoices a chemical called Biotic Alive at $38.35/bottle.  This Biotic Alive is actually a product identified as Husky 404, which costs only $0.92/gallon (**Exhibit 1**, Columns DG-DH).

89. Aftermath invoices a chemical called Biotic FC at $46.33/can. This Biotic FC is actually a product identified as Husky 1240 Foaming Cleanser, which costs only $6/can (**Exhibit 1**, Columns DS-DT).

**d. Unlawful and Fraudulent Double Billing for Work**

90. Aftermath breaks down its billed personnel hours into separate descriptions including:

    a.   Job Setup

    b.   Hazard Safety & Site Assessment

    c.   Biohazard Removal

    d.   Content Manipulation

    e.   Surface Preparation

    f.   Cleaning / BioWash

    g.   Path of Extraction

    h.   Site Inspection/Breakdown

    i.   Biohazard Waste Management

    j.   Personal Property

91. This breakdown of tasks is illusory and billed for the purpose of inflating the number of hours billed by Aftermath employees.

92. The tasks describe are vague, lacking in specificity and represent an overlap of charges.

93. The invoice contains no explanation of the task breakdowns or why Aftermath's separate billing is reasonable.

94. Additionally, the invoice charges for labor on site and decontamination, despite the fact that decontamination is included in the hours already billed.

95. Aftermath charges $78.61 per day for the use of face respirators. These respirators were not brand new for each job, but reused from job site to job site after cleaning and disinfection to reduce waste on Aftermath job sites. Aftermath then charges $129.00 to disinfect the respirators (**Exhibit 1**, Columns BK-BL and CK-CL).

96. Aftermath charges $184.94 per hour for the use of a HEPA Vacuum. This vacuum is presumably not brand new for each job, but reused from job site to job site.

97. Aftermath then charges $148.50 per day to disinfect the vacuum. In addition, Aftermath charges $83.56 for the filters used in the vacuum (**Exhibit 1**, Columns BE-BF and BT-BU).

98. Charges are also levied for ATP testing, and again in the supplies invoice, resulting in duplicate billing (**Exhibit 1**, Columns AW-AX and EH-EI).

**e. Unlawful and Fraudulent Billing for Services of Unskilled Staff**

99. After being contacted, Aftermath sends a supervisor and technicians to the home to complete an assessment, secure a contract, and begin the work as fast as possible.

100.    The securing of signed contracts with these contracting parties is often done by Aftermath Supervisor through inducement, false promises of full payment by the home insurance carrier, and threats of harm to the home should the contracting party not allow Aftermath to complete the work.

101.    Liberty Mutual's policyholders and contracting parties indicated that they felt pressured by Aftermath personnel to sign the contract and start work immediately, despite the ongoing grief of death and their confusion at the process.

102.     In certain claims, the contracting parties have specifically instructed Aftermath to not begin any work in the home unless and until coverage is accepted by Liberty Mutual.

103.     Despite these explicit demands from its customers, Aftermath did not do so, and in some cases, Aftermath lied to the contracting party about contact with Liberty Mutual.

104.     Thereafter, Aftermath personnel specifically instruct the contracting parties and insureds that they are not allowed to be in the home while Aftermath is conducting its remediation.

105.     This refusal to allow people into their own homes ensures that there are no witnesses to Aftermath's fraudulent activities inside the home, or lack of activity.

106.     In multiple documents transmitted from Aftermath to both the contracting parties as well as Liberty Mutual, Aftermath claims that its staff is skilled in the biohazard remediation services, as well as certified in several OSHA regulations.

107.     This Aftermath document titled "Requirements and Best Practices for Trauma Cleaning and Biohazard Removal Companies" says that Aftermath personnel can show evidence of bloodborne pathogen training and compliance, respiratory protection training and compliance, hazardous communication training and compliance, and medical waste handling, transporting, and processing, among other things.

108.     These individuals have no training or specialized certifications.

109.     Aftermath's training includes instructing its personnel to intentionally prolong the number of hours it takes to perform the cleaning services.

110.     Aftermath's personnel make representations or partial representations they know are false or misleading concerning the pricing, application of insurance coverage, and collection practices.

111.     Shell-shocked, the grieving families, wanting to trust, rely on the false and misleading representations and sign the contract.

112.     Despite no evidence of its personnel's training and certifications, Aftermath charges $285.00 per hour for a "Supervisor's" time and $275.00 per hour for a "Certified Technician's" time (**Exhibit 1**, Columns AA – AD).

113.     More recently and without justification to Liberty Mutual, Aftermath has raised its hourly rate in a September 2021 invoice to $325.00 per hour for a "Supervisor's" time and $295.00 per hour for a "Certified Technician's" time (**Exhibit 1**).

114.     Aftermath also falsely claims that it does not use sub-contractors.

115.     In reality, Aftermath uses vendors to complete its biowaste removal and charges Liberty Mutual as if Aftermath's personnel had performed the work at Aftermath's rates.

116.     In furtherance of their ongoing fraudulent scheme, Aftermath takes a number of the above-referenced actions which run counter to the interests of Liberty Mutual's policyholders, their family members, and other people who assist in the wake of a tragic loss.

117.     At each and every point in the process, from the first contact to Aftermath to the final invoice presented to Liberty Mutual, Aftermath takes liberties with the truth and good faith in the interest of falsely inflating costs to be exacted under the applicable homeowner's policy.

118.     Aftermath submits its false invoices and records to Liberty Mutual using the United States mail and Interstate wires.

119.     As set forth above, Liberty Mutual was not on notice of Aftermath's fraudulent billing scheme and Aftermath never disclosed that it was fraudulently inflating its bills.

## VI.     SPECIFIC INSTANCES OF FRAUD

120.     Aftermath has issued demands for payment to Liberty Mutual as set forth in the table marked as **Exhibit 1** filed herewith and incorporated by reference.

121.     Column D in **Exhibit 1** titled "Loss State" represents the two-letter abbreviation of the state connected to Aftermath's demand for payment, based on where the remediation was conducted under the policy issued by Liberty Mutual in Boston, Massachusetts.

122.     Column AE in **Exhibit 1** titled "Total Labor Charged" represents the total amount charged by Aftermath for its hourly personnel charges, including an on-scene Supervisor and a number of Technicians.

123.     Liberty Mutual has repeated requested hourly billing sheets, evidence of break times and periods of meals, evidence of training, compliance, and background checks for its employees, yet been provided nothing by Aftermath to justify these hourly rates.

124.     Column AL in **Exhibit 1** titled "Total Waste Charged" represents the total amount of waste transport boxes, the fees for disposal of the bio-waste, as well as any dumpsters used in the disposal of waste from the homes.

125.     In several instances, outlined below, Liberty Mutual has discovered that Aftermath has misrepresented the Waste Disposal processes, forged or altered Waste Manifest documents, and presented fraudulent claims of the bio-waste disposal process it contracts with vendors.

126.     Column BO in **Exhibit 1** titled "Total Equipment Charged" represents the amount charged by Aftermath simply for its use of equipment, whether or not the equipment was

brand new and never utilized again by Aftermath, or whether the equipment was owned

by Aftermath and thus able to be reused.

127.     Liberty Mutual has repeatedly requested invoices, receipts, order manifests, or

any other documentation from the supplier, manufacturer, or anyone else in the chain of

commerce who provided any equipment indicating the specific type, brand, model, or any

other differentiating information for equipment used.

128.     Column CO in **Exhibit 1** titled "Total Decontamination Charged" represents the

amount charged by Aftermath for its unknown disinfection process, charged completely

separate from the personnel hourly charges. Liberty Mutual has repeatedly requested

information, training manuals, procedural guides, or other documentation explaining

disinfection process and the rates charged which would provide explanation, rationale, or

documentation explaining the rate that Aftermath Services charges for any equipment

disinfection.

129.     Column DU in **Exhibit 1** titled "Total Chemicals Charged" represents the amount

charged by Aftermath for unknown chemicals, for which Liberty Mutual has repeatedly

requested documents or information to prove the specific type, brand, model, or any other

differentiating information for these chemicals but has been provided with nothing.

130.     Column EV in **Exhibit 1** titled "Total Consumables Charged" represents the

amount charged by Aftermath for miscellaneous supplies including knives, towels,

brooms, plastic trash bags, and plastic sheeting, among other items that Aftermath

purportedly uses at properties.

131.     Liberty Mutual has repeatedly requested proof of use of these items, their single-

use nature, and Aftermath's absolute claimed inability to reuse the items (despite being

renewable like a broom or paintbrushes) To date, Aftermath has provided no documents or information to prove the specific type, brand, or model for these items, nor the reason for the extortionist markup on the item charges (**Exhibit 2**).

132.    The following specific matters exemplify Aftermath's scheme and the manner in which the scheme has recently come to Liberty Mutual's attention through investigation in both Massachusetts and other states.

**a.  Liberty Mutual Insured:      D.C.**
**Liberty Mutual Claim No.:  046994265**
**Date of Loss:                       September 20, 2021**

133.    On September 17, 2021, Liberty Mutual insured D.C. was discovered deceased in his home after an unknown period of time.

134.    At the relevant time, D.C. was a resident of Auglaize County, Ohio.

135.    Aftermath was called to the scene and worked on property from September 17 to September 24, 2021.

136.    Despite their awareness of the claim, the work to be done, and Liberty Mutual's insuring of the home, the claim was not reported to Liberty Mutual until September 20, 2021 at 7:39 pm.

137.    An invoice was then not presented to Liberty Mutual until September 28, 2021, despite Aftermath employees leaving the property on September 24, 2021.

138.    In this invoice, Aftermath presented a line item noted as a "Subcontractor Invoice" listed as $3,200.00.

139.    When asked to provide a support for this line item, Aftermath's Trudy Martin provided a copy of an invoice dated September 30, 2021. This invoice listed $3,286.40 for junk hauling, a different amount than what was billed on September 28, 2021.

140.     This invoice provided contained a number of other discrepancies, including the identifying information for the vendor, the date of service, the address of service, and the amount charged to Liberty Mutual.

141.     In this loss Liberty Mutual undertook a basic inquiry into the bill in order to confirm that under the subject policy of insurance, to confirm it was for fair and reasonable charges, and whether it was accurately billed by Aftermath.

142.     Liberty Mutual sought to verify that Aftermath was accurately representing this 1-800-GOT-JUNK invoice.   It did so by contacting the 1-800-Got-Junk vendor and requesting a simple copy of the invoice.

143.     The invoice provided directly by the 1-800-Got-Junk vendor indicated that the price for services rendered to Aftermath, purportedly passed on to Liberty Mutual, was only $1,318.00.

144.     Aftermath materially altered the invoice to raise the rate of its services, which were then charged to Liberty Mutual.

145.     Despite presenting a materially forged invoice, in an attempt to secure higher payment from Liberty Mutual under the policy, Aftermath continues to demand that the invoice is paid in full despite their fraudulent actions and material misrepresentations.

**b.  Liberty Mutual Insured:     J.G.**
**Liberty Mutual Claim No.:  044972139**
**Date of Loss:                  March 4, 2021**

146.     On Thursday, March 4, 2021, Liberty Mutual insured J.G. was found deceased in her home, in bed.

147.     At the relevant time, J.G. was a resident of York County, Pennsylvania.

148.     The Insured's daughter, C.G. called Aftermath on the morning of March 4, 2021, and by 2:00 pm they arrived at the insured home in a big white van, lacking any identifying information or markings.

149.     After an hour, they came downstairs and spoke about what they recommended be done to the home, indicating that hazardous materials had seeped into the floors, potentially into the first-floor ceiling, joists, and into the lower level.

150.     It was at this point that Aftermath personnel recommended to her that the flooring be removed, but C.G. specifically declined. She did not support Aftermath's recommendation of cutting into the floors for only a potential of biohazard.

151.     C.G. works in new home construction and thus was familiar with the construction of floors, levels of the home, and was comfortable in her decision, despite Steven Walters' insistence.

152.     Also in these initial conversations, C.G. specifically instructed that Aftermath obtain approval from Liberty Mutual before completing any services. This conversation took place after C.G. was provided with an initial estimate of roughly $23,000-$24,000 (including cutting to the floor), and balked at the high price of services.

153.     After being assured by Aftermath supervisor that insurance would cover the cost and the Glovers would only be responsible for the deductible, this is the point when C.G. asked that approval for the initial estimate amount be expressly obtained from Liberty Mutual.

154.     Aftermath employee Steven Walters reported to the Insured's Daughter that he had showed photographs to Liberty Mutual on March 4, 2021 and received "verbal approval" to begin work on the home.

155.     The Insured's daughter again reiterated that it was important to her that Liberty Mutual provide express approval of any services before said services were completed in the home.

156.     In response, Aftermath's Supervisor on site advised C.G. that the work was pre-approved by Liberty Mutual and that he had spoken to someone at the insurance company.

157.     This representation by Steven Walters was false.

158.     This loss was not reported to Liberty Mutual until March 5, 2021 at 9:33 am, at which point Aftermath had been on the scene for a day and had half-completed the services.

**c.   Liberty Mutual Insured:     J.G.**
**Liberty Mutual Claim No.:  046744998**
**Date of Loss:                     August 26, 2021**

159.     On August 26, 2021, Liberty Mutual insureds J.G. and J.G. were found deceased in their home after a number of days unattended.

160.     At the relevant time, J.G. was a resident of Loudon County, Tennessee.

161.     In order to remediate the loss, the son of Liberty Mutual's insureds called Aftermath, who came to the property on August 28, 2021. A final invoice for services was presented to Liberty Mutual on September 7, 2021.

162.     During the initial walkthrough, despite billing an exorbitant amount of PPE materials, Aftermath Supervisor Ethan Lewis was not wearing any suits, masks, gloves, or any materials billed in the Supply List.

163.     Furthermore, the Insureds' son J.G. confirmed that Ethan Lewis falsely billed an extra 6 hours of work completed on August 28, 2021 which did not happen.

164.     Despite billing for a technician's time on August 28, 2021, the Insured's son J.G. affirmed that Felicia Prince was not present, did not walk into the home, and did not complete any work on that first day. In reality, technician Felicia Prince falsely billed 7.5 hours of work on August 28, 2021.

165.     In addition to the false billing of personnel hours, Aftermath falsely billed 82 biohazard suits, respirators, and filters, allegedly billing one suit for every hour of work on the property, per person.

166.     Despite Aftermath falsely billing for the hourly changes of PPE materials and suits, Aftermath Supervisor Ethan Lewis advised that the employees were *supposed* to wear PPE, but they normally did not and after getting used to the work, they did not use all of the PPE materials.

**d. Liberty Mutual Insured:     A.A.**
**Liberty Mutual Claim No.:  048700219**
**Date of Loss:                March 3, 2022**

167.     On March 3, 2022, Liberty Mutual insured A.A. experienced his daughter's friend incur a gunshot loss in a single room, the kitchen of the home.

168.     At the relevant time, J.G. was a resident of Hillsborough County, New Hampshire.

169.     On March 4, 2022, Aftermath was called to the property to clean up the kitchen of all biohazard.

170.     Despite being aware of the claim and completing all of the invoiced work on property during the day, Aftermath employees did not report the loss and claim for payment until 10:19 PM on March 4, 2022.

171.     Aftermath timesheets indicate a Supervisor and Technician arrived on site at 6:00 am and were on site until 6:00 pm.

172.     Video camera footage from A.A.'s security cameras, placed in publicly visible locations on his personal property (the front door and the back driveway) where no one had a reasonable expectation of privacy, instead shows Aftermath employees arriving on site at 6:19 am and departing at 5:22 pm.

173.     This video footage also shows the Aftermath duo leaving the property to purchase supplies for the job, absent from the property for 1.37 hours and not completing any remediation work.

174.     Instead, Aftermath falsely billed those 1.37 hours as working onsite time.

175.     At another point in time, one of the Aftermath employees takes a break for 1.23 hours, time which is not reflected in the time sheet.

176.     Aftermath falsely billed supplies, including a biohazard suit change for every hour, 23 suits in total, yet the Aftermath employees did not enter the home until 6 hours after arriving at the property, resulting in 12 falsely billed biohazard suits which were not used.

177.     Aftermath also falsely billed for 5 boxes of biohazard waste. Video footage only supports the filling of 3 boxes, with two other boxes empty and unused.

178.     One of the 5 billed boxes is seen on video being loaded completed empty into the rear of a van.

**e.  Liberty Mutual Insured:       R.R.**
    **Liberty Mutual Claim No.:  047720305**
    **Date of Loss:                     November 28, 2021**

179.     On November 28, 2021, Liberty Mutual's insured R.R. died by gunshot in the garage of his home.

180.     At the relevant time, R.R. was a resident of Hancock County, Illinois.

181.     On November 30, 2021, Aftermath was called to the property to clean up the kitchen of all biohazard.

182.     The invoice for Aftermath's services was not provided until December 7, 2021.

183.     Aftermath's employees made statements to the Insured's son, T.M. that this was a smaller remediation job and if the company wasn't going to make a claim to Liberty Mutual for payment, they would have completed the project for only a "cash tip".

184.     They indicated this because the project would take them only 30 minutes to clean up the home.

185.     Despite these representations, Aftermath employees billed for 2.25 hours of time working onsite. T.M. confirmed the employees were in the van for 1 hour of that time, not working or cleaning.

186.     *A Master Shop Manifest – Regulated Medical Waste* sheet falsely claims the waste was disposed on November 24, 2021, before the waste was even generated.

187.     The date of loss was November 28, 2021 and Aftermath's waste manifest documents claim that biohazard waste was generated on November 30, 2021.

**VII.   CAUSES OF ACTION**

**a.  COUNT I:**

**VIOLATIONS OF 18 U.S.C. § 1962(c)**

a.   In each of the Liberty Mutual claims, Aftermath intentionally caused to be prepared and submitted false, fraudulent, and/or misleading documentation using the U.S. Mail/wires for insurance claims to Liberty Mutual, in furtherance of Aftermath's scheme to defraud.

b.   Aftermath submitted at least two or more mailings/wires, to demand and/or receive payment on certain dates, including, but not limited to, those claims referenced above.

c.  Liberty Mutual routinely corresponded with Aftermath by sending drafts and/or requests for further information and/or other letters relating to claims through the U.S. Mail/wires.

d.  Correspondence, including but not limited to, claim materials, medical records, reports, and other documents were delivered to Liberty Mutual through the U.S. Mail/wires.

e.  As a result of this intentionally false, fraudulent, and/or misleading documentation and other material misrepresentations, Liberty Mutual by its agents and employees, issued payment to Aftermath that would not otherwise have been issued.

f.  Aftermath's fraudulent claims, each appearing legitimate on its face, prevented Liberty Mutual from discovering the fraudulent scheme for a long period of time, enabling Aftermath to evade detection.

g.  Aftermath has knowingly conducted and/or participated, directly or indirectly, in the conduct of its affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted hundreds of fraudulent invoices for services on a continuous basis for more than three years seeking insurance payments under Liberty Mutual insurance policies that Aftermath was never entitled to receive because the claims 1) Involved phony services and charges that were not necessary, reparative, or in some cases, actually performed; 2) Were the result of illegal, deceptive, unfair, and manipulative conduct directed at people taking care of remediation or cleaning up of losses at Liberty Mutual insured properties; and 3) Violated the terms and conditions of the subject Liberty Mutual policies, under which they were purportedly submitted.

h.  A representative sample of the fraudulent bills and corresponding facsimiles submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as **Exhibit 1**.

i.  The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §§ 1341 (Mail Fraud) and 1343 (wire fraud).

j.  Aftermath engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

k.  The unlawful activities of Aftermath involve and affect Interstate commerce.

l.  Aftermath is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty Mutual and other insurers. These inherently unlawful acts are taken by Aftermath in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent biohazard remediation invoicing practices.

m.  The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Liberty Mutual to pay Aftermath.

n.  The activities alleged in this Complaint additionally damaged Liberty Mutual by requiring it to expend resources in the investigation of the improper claims.

o.  As such, Aftermath constitutes an enterprise that is engaged in activities affecting interstate commerce.

p.  Moreover, Aftermath has formed an association-in-fact enterprise with an ascertainable structure, based upon the relationship between Aftermath and others, and the relatedness

of the criminal activities (U.S. Mail/wire fraud) designed with the common purpose of defrauding insurance companies, like Liberty Mutual.

q. Liberty Mutual is in the business of writing insurance and paying legitimate claims throughout the United States. Insurance fraud schemes practiced here, and elsewhere, adversely affect insurance rates across the country. As such, they harm the public at large, and affect interstate commerce.

r. Liberty Mutual is a "person" that has been injured in its business or property by reason of this conduct as defined by 18 U.S.C. § 1961(3).

s. By virtue of Aftermath's violations of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from Aftermath treble the damages sustained by reason of the claims submitted by Aftermath, and others acting in concert with Aftermath, together with the costs of suit, including reasonable attorneys' fees.

WHEREFORE, Liberty Mutual demands judgment against Aftermath as follows:

a. Actual and consequential damages to be established at trial;

b. Treble damages, interest, costs and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

c. Injunctive relief, pursuant to 18 U.S.C. § 1964(a), enjoining Aftermath from engaging in further wrongful activities as alleged in the Complaint and requiring them to disclaim all bills and demands for payment,

d. All other relief this Court deems just.

**b. COUNT II:**

**UNJUST ENRICHMENT**

a. As set forth above, Aftermath has engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

b. When Liberty Mutual paid the bills and charges submitted or caused to be submitted by Aftermath, it reasonably believed that it was legally obligated to make such payments based on the Defendant's improper, unlawful, and/or unjust acts.

c. The Defendant has been enriched at Liberty Mutual's expense by Liberty Mutual's payments which constituted a benefit that Aftermath voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

d. The Defendant's retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

e. By reason of the above, Aftermath have been unjustly enriched in an amount to be determined at trial, but in no event less than $8,500,000.00.

c. **COUNT III:**

**COMMON LAW FRAUD**

a. Defendant was legally and ethically obligated to act honestly and with integrity in connection with their purported performance of the remediation services and their submission of charges and invoices to Liberty Mutual.

b. To induce Liberty Mutual to promptly pay the fraudulent invoices, Aftermath through its personnel at all levels has systematically and willfully concealed its fraud, going to great lengths to do so.

c. Aftermath intentionally made, or caused to be made, material misrepresentations to Liberty Mutual in connection with demands for payment and invoices for services claimed to be completed in insured homes.

d.  Aftermath's intentional misrepresentations include, but are not limited to, the following: (a) creating and submitting false and fraudulent invoices demanding payment for services not actually rendered; (b) creating and submitting false and fraudulent invoices demanding payment for equipment and supplies not actually used or falsely inflated; (c) creating and submitting duplicative charges demanding payment for services already rendered and billed; (d) billing for equipment and supplies without reasonable verification that such materials actually were needed; (e) creating and submitting false and fraudulent invoices charging falsely inflated personnel hourly rates for services of unskilled staff and refusing to provide documentation to support the inflated personnel hourly rates.

e.  Aftermath's representations were intentionally false, or intentionally omitted additional facts necessary, to render the information furnished was not misleading. The misrepresentations were intentionally made by Aftermath in furtherance of their scheme to defraud Liberty Mutual by submitting non-compensable claims for payment.

f.  The foregoing misrepresentations were known by Aftermath to be false, they were made by Trudy Martin, scene Supervisors, and other personnel who had executive authority to know the representations were false, and were made for the express purpose of inducing Liberty Mutual to make payments for claims that were not compensable under applicable law.

g.  Liberty Mutual reasonably relied upon such material misrepresentations to its detriment in paying and investigating numerous unreasonable, unnecessary, inappropriate, and non-meritorious invoices for biohazard remediation services performed at insured homes under dwelling coverages.

35

h. As a direct and proximate result of Aftermath's fraudulent representations and acts, Liberty Mutual has been damaged as previously described herein.

WHEREFORE, Liberty Mutual respectfully requests that this Honorable Court award:

    a. Damages in an amount to be determined at trial representing the whole of Liberty Mutual's actual, consequential, and incidental damages, loss, detriment, and expense caused or occasioned by the actions of Aftermath;

    b. Costs, interest and attorneys' fees; and,

    c. Any additional relief this Court deems just.

**d. COUNT IV:**

**UNFAIR OR DECEPTIVE TRADE PRACTICES**

a. Aftermath intentionally engaged in activities constituting trade or commerce from the home office in the State of Illinois, where it systematically directed unfair and deceptive communications to Liberty Mutual and the contracting customers in that State and in other States including Massachusetts.

b. These activities and communications intentionally induced transactions and conduct, including biohazard remediation activities which resulted in fraudulently and inflated invoices, which were then transmitted to Liberty Mutual to be paid.

c. The acts and omissions of Aftermath and its personnel, in furtherance of its scheme to defraud Liberty Mutual, including, but not limited to, the conduct alleged above, constitute intentionally unfair and deceptive business practices in trade or commerce, as set forth in M.G.L. c.93A and M.G.L. c.176D, as well as the laws and regulations concerning unfair and deceptive trade practices enacted in other States.

d.  The conduct of Aftermath and its personnel in falsely inducing contracting parties to enter into agreements for services, with the intention of passing fraudulent and inflated invoices to Liberty Mutual is an unfair act or business practice.

e.  Upon information and belief, Aftermath engaged in intentionally misleading conduct, and intentionally omitted information necessary for Aftermath's statements not to be misleading.

f.  Aftermath intentionally and deceptively advertised and discussed its services with contracting parties, including providing absolute assurance that a homeowners' insurance carrier would pay for all of its services, to influence these contracting parties to incur charges and fees via Aftermath's invoice.

g.  These invoices and Aftermath's fraudulent and inflated charges were solely for Aftermath's pecuniary gain and without regard to the contracting parties' pecuniary interests.

h.  Aftermath's personnel actively participated in, planned, and induced the unfair and deceptive conduct of Aftermath alleged above, from their positions as Supervisors and other home office employees.

i.  As a result of the above-described deceptive business practices, Liberty Mutual sustained injury and economic damages including, but not limited to:

    a.  All monies paid to Aftermath, in reliance on false Aftermath invoiced amounts;

    b.  The cost of investigating the claims for insurance payments; and,

    c.  The costs incurred in connection with this action (including all attorneys' fees, and costs).

j.  Aftermath's actions described were performed knowing and intentionally. Accordingly, Liberty Mutual is entitled to actual damages, costs and attorneys' fees.

WHEREFORE, Liberty Mutual demands judgment against Aftermath as follows:

      a.  Actual and consequential damages to be established at trial;

      b.  Actual damages, interest, costs and reasonable attorneys' fees;

      c.  Injunctive relief enjoining Aftermath from engaging in the wrongful activities alleged in the Complaint and requiring them to disclaim all bills and demands for payment issued to Liberty Mutual;

      d.  Costs and interest; and,

      e.  Any other relief this Court deems just.

**d.  COUNT V:**

**TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP**

a.  Aftermath presents invoices pursuant to the existence of Liberty Mutual's enforceable insurance contracts (the homeowners' policy) between Liberty Mutual and its policyholder.

b.  Aftermath is aware of the contractual relationship as they turn to Liberty to payment under this contract.

c.  In furtherance of its scheme, Aftermath has intentionally interfered with Liberty Mutual's relationship with its policyholders.

d.  Aftermath has interfered in these relationships through improper means including emails, voicemails, telephone communications, and written communications to insureds and contracting parties.

e.  In this interference, Aftermath falsely claims that Liberty Mutual is:

    a.   Refusing to extend coverage;

    b.   Failing to commit to proper coverages;

    c.   Refusing to make fair and equitable settlements of claims;

    d.   Withholding payment from Insureds.

f.   As a direct result of Aftermath's improper communications to insureds, Liberty Mutual has lost advantage with its contractual customers.

WHEREFORE, Liberty Mutual demands judgment against Aftermath as follows:

    a.   Actual and consequential damages to be established at trial;

    b.   Actual damages, interest, costs and reasonable attorneys' fees;

    c.   Injunctive relief enjoining Aftermath from engaging in wrongful communications with Liberty Mutual's policyholders and related contracting parties;

    d.   Costs and interest; and,

    e.   Any other relief this Court deems just.

**f.   COUNT VI:**

**CONVERSION**

a.   In furtherance of its fraudulent scheme, Aftermath conducts excessive, unnecessary, and unreasonable demolition of Liberty Mutual insured properties.

b.   In this excessive demolition, Aftermath destroys building materials in homes including tile, carpet, wood, vinyl, laminate, concrete, drywall, paint, and other surfaces.

c.   Aftermath takes these materials from the home and destroys them without consent of the Insured or Liberty Mutual.

d.   This destruction of materials in the home is contrary to the insured's interest in the home and building materials.

e.  Aftermath committed this conversion/vandalism when it intentionally damaged the insured property when retained to perform remediation services.

f.  Aftermath induced Liberty Mutual to pay for excessive demolition, without provide notice, receiving consent, or providing a scope of the services in advance.

g.  Liberty Mutual is entitled to recover those monies paid for the vandalism and damages from the conversion.

WHEREFORE, Liberty Mutual respectfully requests that this Honorable Court award:

a.  Damages in an amount to be determined at trial representing the whole of Liberty Mutual's actual, consequential, and incidental damages, loss, detriment, and expense caused or occasioned by the actions of Aftermath;

b.  Costs, interest and attorneys' fees; and,

c.  Any additional relief this Court deems just.

**g.  COUNT VII:**

**RELIEF UNDER 28 U.S.C. § 2201 DECLARATORY JUDGMENT ACT**

a.  There is an actual case in controversy between Liberty Mutual and Aftermath regarding more than $8,500,000.00 in fraudulent and inflated claims for the purported remediation service that Aftermath has submitted to Liberty Mutual.

b.  To be eligible to receive benefits under the policy, an assignee or contracted party must comply with the law.

c.  Aftermath made intentional and materially false statements to Liberty Mutual and its contracted customer in invoices and claims for payment to improve the appearance of the claims.

d.  Aftermath intentionally submitted unreasonable demands for payment based upon undocumented, unsupported, and false claims of equipment usage, chemical usage, false and illusory disinfection charges, and fraudulent miscellaneous fees.

e.  Aftermath has demanded payment for services, equipment, and supplies that were unnecessary when purportedly issued, resulting in demands by Aftermath for payment for unnecessary and unreasonable charges.

f.  Aftermath has intentionally demanded payment for supplies not actually used.

g.  Aftermath has no right to receive payment for any pending invoices submitted to Liberty Mutual because of the foregoing.

WHEREFORE, Liberty Mutual demands judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, against Aftermath declaring that:

a.  Aftermath acted unlawfully as set forth above;

b.  Liberty Mutual is entitled to deny past, pending, and future insurance claims from Aftermath involving the patterns of conduct set forth above; and,

c.  Aftermaths' conduct is wrongful and in violation of duties established by law.

**VIII.  JURY DEMAND**

Liberty Mutual demands a trial by jury on all counts in this Complaint.

Respectfully Submitted,

LIBERTY MUTUAL INSURANCE
COMPANY, LIBERTY MUTUAL
FIRE INSURANCE COMPANY, and
LIBERTY MUTUAL PERSONAL
INSURANCE COMPANY
By their Attorneys,

*//Timothy W. Tapply//*
*//Shahan J. Kapitanyan//*

_____
Timothy W. Tapply, BBO# 651558
ttapply@brandtapply.com
Shahan J. Kapitanyan, BBO# 654055
skapitanyan@brandtapply.com
Brand & Tapply LLC
555 Washington Street, Suite 6
Wellesley, MA 02482
Phone: 781-431-7878
Fax: 781-431-7844

Dated:  June 30, 2022