UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, and LIBERTY MUTUAL PERSONAL INSURANCE COMPANY, | * * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 22-cv-11052-ADB |
| AFTERMATH SERVICES LLC, AFTERMATH HOLDINGS LLC, J. DOUGLAS BERTO, KEVIN REIFSTECK, TINA BAO, MICHAEL LOPRESTI, CASEY DECKER, and John Does 1-10, | * * * * * * | |
| Defendants. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, and

Liberty Mutual Personal Insurance Company (collectively "Liberty Mutual" or "Plaintiff") allege

that Aftermath Services LLC, Aftermath Holdings LLC (collectively, "Aftermath"), and

Aftermath current and former employees, J. Douglas Berto, Kevin Reifsteck, Tina Bao, Michael

Lopresti, Casey Decker, and John Does 1–10 (collectively, "Aftermath Employees")

(collectively with Aftermath, "Aftermath and Employees" or "Defendants"), engaged in a

scheme to defraud Plaintiff and its customers.  See [ECF No. 26 ("First Amended Complaint" or

"FAC")].  Defendants, in turn, raise several counterclaims.  See [ECF No. 49 ("Counterclaim

Complaint" or "CC Compl.")].  Currently before the Court are: (1) Defendants' partial motion to

dismiss the First Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6),

[ECF No. 47], (2) Plaintiff's cross-motion to amend its First Amended Complaint, [ECF No. 50],

and (3) Plaintiff's motion to dismiss Defendants' counterclaims, pursuant to Rule 12(b)(6), [ECF No. 54].  For the reasons set forth below, Defendants' partial motion to dismiss, [ECF No. 47], is GRANTED, Plaintiff's cross-motion to amend, [ECF No. 50], is DENIED, and Plaintiff's motion to dismiss Defendants' counterclaims, [ECF No. 54], is GRANTED.

**I.      PROCEDURAL BACKGROUND**

Plaintiff filed its original complaint against Aftermath on June 30, 2022, [ECF No. 1],[1] and its First Amended Complaint, against Aftermath and Employees, on July 22, 2022.  The First Amended Complaint includes a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, pursuant to 18 U.S.C. § 1962(c) (Count I), as well as claims for unjust enrichment (Count II); common law fraud (Count III); unfair or deceptive trade practices (Count IV); tortious interference with a business relationship (Count V); conversion (Count VI); and declaratory relief (Count VII).  [FAC at 38–50].  On September 12, 2022, Defendants filed a motion to dismiss Counts I, V, and VI; all claims raised against the Individual Defendants; and the claims asserted on behalf of Plaintiff's insureds, [ECF No. 47], and asserted counterclaims for commercial disparagement (Counterclaim I) and tortious interference with business relationships (Counterclaim II), [CC Compl. ¶¶ 89–101].  Plaintiff opposed Defendants' partial motion to dismiss and filed motions to amend its First Amended Complaint, [ECF No. 50], and to dismiss Defendants' counterclaims, [ECF No. 54], both of which are opposed by Defendants, [ECF Nos. 56, 62].

---

[1] Plaintiff filed a motion for a temporary restraining order on the same day, which the Court denied on August 10, 2022.  [ECF Nos. 3, 32].

## II.        LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 76, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Id. at 570.  "To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).  "The plausibility standard invites a two-step pavane."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45).  First, "the [C]ourt must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Second, "the [C]ourt must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Morales-Cruz, 676 F.3d at 224).

## III.       DEFENDANTS' PARTIAL MOTION TO DISMISS AND PLAINTIFF'S CROSS-MOTION TO AMEND

### A.        Background

The following facts are taken from the First Amended Complaint, the factual allegations

of which are assumed to be true when considering a motion to dismiss.  Ruivo v. Wells Fargo
Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

Liberty Mutual is a nationwide provider of home insurance.  [FAC ¶ 67].  Aftermath is a
provider of biohazard remediation services, that is, "cleanup of . . . various biohazard losses,
including unattended deaths, crime scenes, suicides, and other losses of human life which result
in blood, body fluids, and other biological substances."  [Id. ¶ 4].  As noted above, the Individual
Defendants are employed by Aftermath.  [Id. ¶ 2].

Beginning in January 2016 through at least the date of the filing of the First Amended
Complaint, Defendants have engaged in a scheme "to create overinflated and fraudulent charges"
associated with Aftermath's remediation services, which are then passed on to Plaintiff and its
insureds, family members, and their estates.  [FAC ¶¶ 11, 18].  Plaintiff's policies provide
coverage "for accurate, reasonable, and necessary charges" for remediation services performed
in insured homes.  [Id. ¶ 68].  As such, Plaintiff regularly works with "service vendors[] and
contractors," including Aftermath, and "receives and pays bills and invoices for [remediation]
services completed in" insured homes.  [Id. ¶ 73].

Generally, either the remediation services provider or the homeowner puts Plaintiff on
notice of the need for such services before any remediation work begins, [FAC ¶¶ 70–72], but
Defendants regularly delay giving notice of their work to Plaintiff, sometimes by several days,
and almost always submit invoices only after remediation work has begun, see [id. ¶¶ 79–86,
91].  Defendants also encourage homeowners to sign contracts to allow the work to commence
quickly, by "inducement, false promises of full payment [for the work] by the home insurance
carrier, and threats of harm to the home should the contracting party not allow Defendants to
complete the work."  [Id. ¶ 134].  In some cases, homeowners refuse to allow Defendants to

begin work without Plaintiff's approval, but Defendants ignore homeowners' refusal and Plaintiff's lack of approval and begin their work anyway.  [Id. ¶¶ 136–137].  Defendants also force homeowners to leave their homes while work is being completed, resulting in them being unable to verify what work is or is not being done.  [Id. ¶¶ 138–139].  This all ensures that Plaintiff is unable to conduct its own assessment of the damage or the necessity and reasonableness of any remediation services before Defendants begin work, which forces Plaintiff to rely on invoices and other documents provided by Defendants in reviewing and approving claims.  [Id. ¶¶ 89–91].  As a consequence, Defendants are able to "perform [and charge for] excessive, unnecessary, and unwarranted demolition."  [Id. ¶ 90].

Defendants also over-charge for equipment, supplies, and chemicals by, for example, inflating the cost of chemicals and other supplies, as compared to industry standard costs and even common retail prices, see [FAC ¶¶ 95–99, 101–107, 113–123], and double-billing for the use and cleaning of reusable equipment, [id. ¶¶ 128–132].  Further, Defendants' invoices obscure overbilling by using vague and overlapping descriptions of work, such as "Hazard Safety & Site Assessment," "Biohazard Removal," "Content Manipulation," "Cleaning / BioWash," and "Biohazard Waste Management."  [Id. ¶¶ 124–127].  Defendants also claim that all work is conducted by their own employees when in fact they use subcontractors, [id. ¶¶ 148–149], misrepresent that their employees are specially trained in biohazard remediation services, [id. ¶¶ 140–142], and then charge more for their work based on this special training, when in fact they have no such training or specialized certifications, [id. ¶¶ 146–147].

### B.    Discussion

#### 1.    Count I: Pattern of Racketeering Activity, 18 U.S.C. § 1962(c)

To state a claim for a violation of § 1962(c) a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Sedima, S.P.R.L. v. Imrex Co., 473

U.S. 479, 496 (1985).[2]  Further, a plaintiff, "must allege . . . the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). Defendants argue that Plaintiff's § 1962(c) claim must be dismissed because Plaintiff "has not alleged a 'person' and a separate 'enterprise,' or how the 'person' has used the 'enterprise' for racketeering purposes." [ECF No. 48 at 5]; see [id. at 5–8]. Plaintiff responds that it "ha[s] identified the correct participants who further the criminal enterprise and have taken over the corporation's legitimate organization and purposes," [ECF No. 50 at 4], and, without explicitly saying so, suggests that its proposed second amended complaint, [ECF No. 50-1 ("Proposed Second Amended Complaint" or "Proposed SAC")], addresses any deficiencies in the First Amended Complaint, see [ECF No. 50 at 4].

"[T]he unlawful enterprise itself cannot also be the person the plaintiff charges with conducting it." Doyle v. Hasbro, Inc., 103 F.3d 186, 190 (1st Cir. 1996) (citations omitted). "This is because Section 1962(c) seeks to punish the culpable person who misuses the enterprise." Deane v. Weyerhaeuser Mortg. Co., 967 F. Supp. 30, 33 (D. Mass. 1997) (citing Schofield v. First Commodity Corp. of Boston, 793 F.2d 28, 30–31 (1st Cir. 1986)). Where a corporation is alleged to be a liable "person," "[t]he distinction requirement is not satisfied by merely naming a corporation and its employees, affiliates, and agents as an association-in-fact." Mear v. Sun Life Assur. Co. of Can. (U.S.)/Keyport Life Ins. Co., No. 06-cv-12143, 2008 WL

---

[2] Under § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).  The statute defines "racketeering activity" by providing an enumerated list of crimes and defines "pattern of racketeering activity" as "at least two acts of racketeering activity" occurring within ten years of each other.  18 U.S.C. §§ 1961(1), (5).

245217, at *9 (D. Mass. Jan. 24, 2008) (quoting <u>Rodriquez v. Banco Cent.</u>, 777 F. Supp. 1043, 1054 (D.P.R. 1991), <u>aff'd sub nom.</u> <u>Rodriguez v. Banco Cent. Corp.</u>, 990 F.2d 7 (1st Cir. 1993)). In other words, "[w]here the plaintiffs have suffered harm at the hands of an enterprise that consists only of a single corporation and its employees, subsidiaries or agents, the plaintiffs 'must choose between the corporation and its constituents as persons liable.'"  <u>In re Lupron Mktg. & Sales Pracs. Litig.</u>, 295 F. Supp. 2d 148, 172–73 (D. Mass. 2003) (quoting <u>Rodriquez</u>, 777 F. Supp. at 1054).[3]  Here, although the First Amended Complaint provides varying formulations, it appears that Plaintiff is alleging that Aftermath and the Individual Defendants

---

[3] In <u>Cedric Kushner Promotions</u>, the Supreme Court held that "a claim that a corporate employee is the 'person' and the corporation is the 'enterprise'" satisfies "the need for two distinct entities."  533 U.S. at 164, 168.  That said, the Supreme Court explained that this context differed from a case in which "a corporation [is asserted to be] the 'person' and the corporation, together with all its employees and agents, [is asserted to be] the 'enterprise,'" and stated explicitly that it was not "consider[ing] the merits of [such] cases, and not[ing] only their distinction from the instant case."  <u>Id.</u> at 164.

Since then, courts have reaffirmed that allegations that a corporation is the "person" and a corporation and its employees are the "enterprise" differ substantially from the context in <u>Cedric Kushner Promotions</u> and do not satisfy the distinctness requirement.  <u>See, e.g.</u>, <u>Ray v. Spirit Airlines, Inc.</u>, 836 F.3d 1340, 1356 (11th Cir. 2016) ("The plaintiffs argue that the distinction highlighted by the Supreme Court is not one that compels a different result because the relationships alleged in this case are just as much an enterprise as those found in <u>Cedric Kushner</u>. But recognizing that distinction—far from being an exercise in sophistry—is very important.  In this case, the corporation is the defendant person, and the corporation, together with its officers, agents, and employees, are said to constitute the enterprise.  Every circuit that has squarely decided this matter has recognized this distinction. . . . We, too, hold that plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation because a corporation necessarily acts through its agents and employees.  For our purposes, there is no distinction between the corporate person and the alleged enterprise." (citing <u>Cruz v. FXDirectDealer, LLC</u>, 720 F.3d 115, 121 (2d Cir. 2013); <u>Fitzgerald v. Chrysler Corp.</u>, 116 F.3d 225, 226–28 (7th Cir. 1997); <u>Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.</u>, 30 F.3d 339, 343–44 (2d Cir. 1994); <u>Bd. of Cty. Comm'rs of San Juan Cty. v. Liberty Grp.</u>, 965 F.2d 879, 886 (10th Cir. 1992))).

are "persons" liable.[4]  Further, Plaintiff alleges that Aftermath, standing alone, is an enterprise,[5] and, presumably alternatively, that Aftermath, with the named Individual Defendants, and other employees, are an enterprise.[6]  As such, Plaintiff seeks to hold both Aftermath, the corporation, and its employees liable, while also treating Aftermath as an enterprise, or Aftermath and its employees together as an enterprise.  Either formulation of the enterprise fails to allege two distinct entities.  Therefore, as alleged, Plaintiff does not state a RICO claim pursuant to 18 U.S.C. § 1962(c).

> 2.    Other Claims Against the Individual Defendants

Defendants argue that all other claims against the Individual Defendants must be dismissed because Plaintiff fails to allege that the Individual Defendants "took any actions outside the scope of their employment that would justify individual liability."  [ECF No. 48 at 8].

---

[4] For example, the First Amended Complaint defines "Defendants" as "Aftermath Services LLC and Aftermath Holdings LLC," see [FAC ¶¶ 1, 43], and then alleges that "[b]y virtue of Defendants' violations of 18 U.S.C. § 1962(c), Liberty Mutual is entitled to recover from Defendants," [id. at 42].  Additionally, as specifically relevant to the RICO claim, the First Amended Complaint alleges that "[t]here is an actual case in controversy between Liberty Mutual and Aftermath *and its named Employees*," and both that "Aftermath is engaged in inherently unlawful acts" and that "Defendants J. Douglas Berto, Kevin Reifsteck, Tina Bao, Michael Lopresti, Casey Decker, and yet unknown employees John Does 1-10 are engaged in inherently unlawful acts."  [Id. at 38, 41].

[5] See [FAC at 38 ("Aftermath is an ongoing 'enterprise'")].

[6] See, e.g., [FAC at 39 ("The Defendants, and other individuals known and unknown to Liberty Mutual, constitute an enterprise . . . and, in combination, constitute an Association-In-Fact enterprise separate and distinct from any one Defendant named herein."); id. at 41 ("Defendants constitutes an enterprise"); id. at 42 ("Defendants have formed an association-in-fact enterprise")].

Plaintiff does not explicitly respond to this argument but argues more generally that, as alleged, the Individual Defendants may be held liable for their conduct.  See [ECF No. 50].

To survive a motion to dismiss, a "complaint should at least set forth minimal facts as to who did what to whom, when, where, and why."  Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 68 (1st Cir. 2004).  "In order to satisfy the minimal requirements of notice pleading, a plaintiff cannot 'lump' multiple defendants together and must 'state clearly which defendant or defendants committed each of the alleged wrongful acts.'"  Canales v. Gatzunis, 979 F. Supp. 2d 164, 170 (D. Mass. 2013) (quoting Bagheri v. Galligan, 160 F. App'x 4, 5 (1st Cir. 2005)) (other citations omitted).  Further, although "[o]fficers of a corporation do not . . . incur personal liability for torts committed by corporate employees merely by virtue of the position they hold in the corporation," see [ECF No. 48 at 8 (quoting Taylor v. Swartwout, 429 F. Supp. 2d 209, 213 (D. Mass. 2006) (internal citations omitted))], "[c]orporate officers are personally liable for any tortious activity in which they personally participate," Taylor, 429 F. Supp. 2d at 213 (internal citation omitted).

Here, Plaintiff does not identify specific conduct committed by specific Individual Defendants, and instead generally alleges that all Individual Defendants engaged in all alleged conduct.  See, e.g., [FAC ¶ 14 ("At each level, the Defendant companies and CEO J. Douglas Berto, Vice President Kevin Reifsteck, Chief Revenue Officer Tina Bao, General Manager and Chief Business Officer Michael Lopresti, Vice President Casey Decker, and yet unknown employees John Does 1-10 willfully, knowingly, and intentionally undertake all of the acts and omissions of Defendants described throughout this Amended Complaint."); id. ¶ 129 ("Defendants charge $78.61 per day for the use of face respirators.")].  These allegations lack the requisite particularity to either meet the notice pleading standard or to justify the imposition of

tort liability on any of the Individual Defendants.  The Court therefore finds that, as currently

pleaded, Plaintiff has failed to state claims against the Individual Defendants.

> 3.   <u>Other Bases for Dismissal</u>

Defendants also ask the Court to dismiss:

- Count V [tortious interference with a business relationship] for failure to assert a claim because Liberty Mutual fails to allege that: (1) any contractual relationship was broken; (2) Defendants knowingly induced the breaking of any relationship; or (3) Defendants' supposed interference was improper in motive or means;

- All claims Liberty Mutual attempts to assert on behalf of its insureds because Liberty Mutual lacks standing to assert such claims; and

- Count VI [conversion] for failure to state a claim because Liberty Mutual had no ownership interest in any property that was purportedly converted.

[ECF No. 48 at 2].  In addition, Defendants argue Plaintiff's claims and damages are limited by

the applicable statutes of limitation.  [<u>Id.</u> at 16-20].  Plaintiff's opposition did not address any of

these arguments.  <u>See generally</u> [ECF No. 50].[7]  As such, Plaintiff has waived its objections to

these arguments and these claims.  <u>See</u> <u>Peterson v. E. Bos. Sav. Bank</u>, No. 17-cv-11776, 2018

WL 4696746, at *2 (D. Mass. Sept. 29, 2018) (citations omitted) ("[P]laintiffs' response to the

motion to dismiss does not offer any argument against the defendants' judicial estoppel ground

for dismissal.  Their failure to oppose this argument amounts to a waiver of any objection to it.");

<u>Mahoney v. Found. Med., Inc.</u>, 342 F. Supp. 3d 206, 217 (D. Mass. 2018) (citation omitted)

(finding that because "Plaintiff's opposition to Defendants' Motion to Dismiss fail[ed] to

respond to Defendants' arguments that [a] claim should be dismissed[,] Plaintiff ha[d] waived"

this claim); <u>Perkins v. City of Attleboro</u>, 969 F. Supp. 2d 158, 177 (D. Mass. 2013) (finding

---

[7] In its Proposed Second Amended Complaint, Plaintiff adds a single allegation related to its conversion claim, that is, that "[b]y paying the claims of [i]nsureds for the damage done by the Defendant[s,] Liberty Mutual is subrogated to the rights of its insured," [Proposed SAC ¶ 379], but Plaintiff fails to explain how this allegation cures the defect identified by Defendants.

claim waived where Plaintiff's opposition failed to respond to Defendant's argument).
Defendants' partial motion to dismiss on these grounds is thus <u>GRANTED</u>.

### C.     Plaintiff's Cross-Motion to Amend

A court may deny leave to amend for reasons including "undue delay, bad faith or
dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments
previously allowed, undue prejudice to the opposing party by virtue of allowance of the
amendment, [and] futility of amendment." <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).  "[I]f the
proposed amendment would be futile because, as thus amended, the complaint still fails to state a
claim, the district court acts within its discretion in denying the motion to amend." <u>Abraham v.
Woods Hole Oceanographic Inst.</u>, 553 F.3d 114, 117 (1st Cir. 2009) (quoting <u>Boston & Me.
Corp. v. Hampton</u>, 987 F.2d 855, 868 (1st Cir. 1993)) (alteration in original).

The Proposed Second Amended Complaint includes new allegations with further details
on how Defendants engage customers and submit claims to insurers.  <u>See, e.g.</u>, [Proposed SAC
¶¶ 19–36, 40–41].  It also includes new allegations of conduct by the Individual Defendants.
<u>See, e.g.</u>, [<u>id.</u> ¶ 8 ("To conceal the fraudulent scheme even further, CEO J. Douglas Berto, Vice
President Kevin Reifsteck, Chief Revenue Officer Tina Bao, General Manager and Chief
Business Officer Michael Lopresti, Vice President Casey Decker, and yet unknown employees
John Does 1-10, conspired to recruit lower-level employees of the company to carry out the
unlawful actions, reaping as much profit as possible from insurance companies such as Liberty
Mutual."); <u>id.</u> ¶ 127 ("In furtherance of the fraudulent scheme developed by the Managing
Defendants, it has become their fraudulent business practice to delay a phone call, email or any
other means of putting Liberty Mutual on notice that Defendants['] personnel are at the insured
property, have been requested to begin services by someone at the property, and/or have

discussed contracts with the customer.")].  It also proposes adding allegations to the effect that

each of the Individual Defendants were engaged in the enterprise for their own purposes, rather

than for Aftermath's benefit.  See, e.g., [Id. ¶ 67 ("At a bare minimum, J. Douglas Berto

willingly turned a blind eye to the rampant enterprise of defrauding the Plaintiff and *enjoyed the*

*benefits of his participation in said enterprise*.") (emphasis added); id. ¶ 43 ("J. Douglas Berto,

as the chief executive officer, knew or should have known about the discrepancies in the

company's records, the actions of the company's employees, as well as the submission of

fraudulent bills which led to *his ultimately ill-gotten gains*.") (emphasis added)].[8]  Finally,

through its amendments, Plaintiff seeks to seek to clarify that Aftermath is a legitimate business

that is being misused.  See, e.g., [id. ¶¶ 1, 3–5, 10, 89].

The Court finds that none of Plaintiff's proposed amendments overcome the legal

deficiencies addressed in this Order.  First, Plaintiff's proposed amendments related to the

Individual Defendants' conduct suffer from the same lack of specificity as its current allegations

and similarly fail to justify imposing liability on the Individual Defendants.

Second, if in fact, the Individual Defendants were engaged in racketeering conduct for

their own benefit, this could establish distinctness between the Individual Defendants and

Aftermath.  Cf. Bessette v. Avco Fin. Servs., Inc., 230 F.3d 439, 449 (1st Cir. 2000) ("[W]here

employees of a corporation associate together to commit a pattern of predicate acts in the course

of their employment and *on behalf of the corporation*, the employees in association with the

corporation do not form an enterprise distinct from the corporation." (quoting Riverwoods

Chappaqua, 30 F.3d at 344) (emphasis added))), amended on denial of reh'g (Dec. 15, 2000).

---

[8] See also [Proposed SAC ¶¶ 44–47, 70, 74, 78, 82 (same allegations, verbatim, as to each of the other named Individual Defendants)].

That said, given that Plaintiff has failed to allege any specific conduct by specific Individual Defendants, the proposed allegations related to Individual Defendants' supposed motivation for engaging in any conduct are too conclusory to establish distinctness between Aftermath and the Individual Defendants.

Finally, although Plaintiff has added allegations that Aftermath is being "misused," Plaintiff still alleges that Aftermath, along with the Individual Defendants, are liable,[9] while also identifying the enterprise as comprised of Aftermath and the Individual Defendants.[10]  As discussed *supra*, these allegations do not establish a distinct "person" and "enterprise" for purposes of a RICO claim.  Plaintiff's cross-motion to amend its First Amended Complaint, [ECF No. 50], is therefore DENIED as futile.

To the extent that Plaintiff considers filing and receives permission to file a renewed motion to amend its allegations related to its RICO claim, any such motion will be denied unless the new proposed amended complaint alleges a distinct "person" and "enterprise," as required by

---

[9] See, e.g., [Proposed SAC ¶ 334 ("Aftermath is engaged in inherently unlawful acts separate from its legitimate business operations"); id. ¶ 332 ("Defendants J. Douglas Berto, Kevin Reifsteck, Tina Bao, Michael Lopresti, Casey Decker, and yet unknown employees John Does 1-10 are engaged in inherently unlawful acts"); id. ¶ 318 (specific to the RICO claim, "[t]here is an actual case in controversy between Liberty Mutual and Aftermath and its named Employees"); id. ¶ 311 ("[The] enterprise is an association-in-fact conspiracy to defraud Liberty undertaken by the Defendants[], their executives, agents, or employees, by using Aftermath's legitimate business operations as a smokescreen for illegitimate and illegal racketeering practices.")]; see also [ECF No. 50 ¶ 29 ("Because this is unlawful activity, it is axiomatically outside the scope of Aftermath's legitimate business, making Aftermath a participant in the illegal activity.")].

[10] See, e.g., [Proposed SAC ¶ 310 ("Aftermath is a participant in an ongoing 'enterprise'"); id. ¶ 311 ("[The] enterprise is an association-in-fact conspiracy to defraud Liberty undertaken by the Defendants[], their executives, agents, or employees"); id. ¶ 338 ("The Defendants, and other individuals known and unknown to Liberty Mutual, constitute a conspiracy that is engaged in activities affecting interstate commerce and, in combination, constitute an Association-In-Fact enterprise."); id. ¶ 319 ("Defendants have formed an association-in-fact enterprise")].

the statute and relevant caselaw, and identifies specific conduct committed by specific Individual Defendants.

## IV.   PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS

### A.   Background

The following facts are taken from Defendants' Counterclaim Complaint, [ECF No. 49], the factual allegations of which are assumed to be true.  Ruivo, 766 F.3d at 90.

#### 1.   Aftermath's Process for Commencing Remediation Work

When a potential customer contacts Aftermath, they are directed to a third-party call center, before being connected to Aftermath's Central Operations team, who then dispatches a local team.  [CC Compl. ¶ 9].  Once on-site, the local team assesses the site and formulates a recommendation regarding the scope of the remediation work required, which they then relay to a supervisor.  [Id. ¶¶ 10–13].  The supervisor communicates the scope of the work to the customer and, if the customer agrees, the customer signs a "general services agreement" with Aftermath ("Customer Contract").  [Id. ¶¶ 15–16].  Work often begins immediately and takes between one and four days to complete.  [Id. ¶¶ 18–19].  Thereafter, within 24 to 48 hours of the work being completed, Aftermath invoices the customer and, where applicable, the insurer.  [Id. ¶¶ 20–21].  In their Customer Contract, the customer agrees (1) to allow Aftermath to work directly with the customer's insurer to negotiate coverage of the remediation services and (2) to pay for anything not covered by the insurer.  [Id. ¶¶ 17, 21–22].

#### 2.   Liberty Mutual's Disparaging Remarks about Aftermath and Interference with Aftermath Contracts

Some of Aftermath's customers have Liberty Mutual insurance.  [CC Compl. ¶¶ 24–25].  Aftermath and Liberty Mutual do not have a contract that directly governs their relationship.  [Id.].  Liberty Mutual has made disparaging remarks about Aftermath and has recommended that

customers not use Aftermath, even after customers signed contracts with Aftermath.  [Id. ¶ 26].
The Counterclaim Complaint provides the following examples.

i.      Customer One

A customer engaged Aftermath to provide remediation services relating to the death of
his father.  [CC Compl. ¶¶ 27–28].  The customer signed a Customer Contract and Aftermath
commenced work.  [Id. ¶¶ 28–29].  After the first day, Aftermath and the customer agreed to
pause work while they waited to hear from Liberty Mutual.  [Id. ¶ 29].  Three days later, Bryan
Fly, a Liberty Mutual insurance adjuster, told the customer that he would prefer that the
customer use a remediation services provider other than Aftermath, because: "(1) Aftermath is
not a reputable company, and (2) Aftermath is notorious for suing property owners for work
done when the insurance company does not pay the claim."  [Id. ¶¶ 30–31].  He also stated "that
Aftermath overbilled for its services."  [Id. ¶ 30].  When the customer called the alternative
provider recommended by Fly, he learned that that company "performed clean-up services on a
part-time basis [and] was not licensed to do asbestos remediation (which was required for the
customer's remediation)," but the company "offered to remove the asbestos anyway."  [Id. ¶ 31].
When the customer told Fly that he would not work with that company, Fly told the customer he
would still need to use a provider other than Aftermath.  [Id. ¶ 32].

ii.      Customer Two

In June 2022, another potential customer contacted Aftermath "to perform trauma
cleaning and biohazard remediation."  [CC Compl. ¶ 33].  Aftermath conducted an onsite
assessment on July 11 and gave the customer a recommended scope of work.  [Id. ¶¶ 35–36].  On
the same day, Aftermath contacted Liberty Mutual to verify the customer's insurance coverage,
the customer signed a Customer Contract, and Aftermath began "some initial work."  [Id. ¶¶ 37–
40].  Within hours of this work, Aftermath called Liberty Mutual to file a claim and sent

15

"photographs [and] a breakdown of the initial estimate, and inquired about onsite inspection by a Liberty Mutual adjuster."  [Id. ¶ 41].

Over the following weeks, Aftermath reached out to Liberty Mutual numerous times, but was unable to get authorization to resume work.  [CC Compl. ¶¶ 42–48].  Toby Puls ("Puls"), a Liberty Mutual claims adjuster, eventually informed Aftermath on July 20 that an on-site inspection was scheduled for the following day.  [Id. ¶ 49].  On July 21, a Liberty Mutual field adjuster inspected the property and recommended a scope of work that was more extensive than what Aftermath had recommended.  [Id. ¶¶ 49–51].  Aftermath did not hear anything from Liberty Mutual for several days, so Aftermath reached out again, and Liberty Mutual responded that they were continuing to review Aftermath's proposal.  [Id. ¶¶ 52–54].  On July 29, Aftermath reached out again to Puls, who responded: "[t]he adjuster still needs to discuss with the customer.  From the field inspection there is no remaining damages [sic] and you can submit for what work you have completed so far."  [Id. ¶¶ 55–56].  Aftermath communicated this to the customer, and the customer said this contradicted what the field adjuster had recommended.  [Id. ¶ 57].  When Aftermath responded to Puls, copying the customer, Puls did not respond.  [Id. ¶ 58].

On August 11, after some additional back and forth, the customer informed Aftermath that they had spoken to Puls who explained that Liberty Mutual "would like [the customer] to use a different company for any remaining work, as . . . the cost of Aftermath in particular is significantly higher than other similar companies."  [CC Compl. ¶ 61].  After some additional back and forth, on August 22, Aftermath sent Liberty Mutual and the customer an invoice for their initial work for the customer.  [Id. ¶¶ 62–64].

iii.        Customer Three

"On July 29, 2022, Aftermath was called to a scene that required trauma cleaning and biohazard remediation." [CC Compl. ¶ 66]. The on-site team made an assessment as to the scope of the work required, a supervisor communicated that recommendation to the customer, the customer signed a Customer Contract, and Aftermath began initial work. [Id. ¶¶ 67–69, 72]. After completing this initial work, Aftermath contacted SafeCo, the customer's insurance provider and a Liberty Mutual subsidiary, to file a claim, and sent an email with "initial photos and a breakdown of the initial estimate." [Id. ¶¶ 70–71, 73].

On August 3, Aloyis Gray ("Gray"), a Liberty Mutual field adjuster, contacted Aftermath to get a "rundown of damages [and] a brief description of the scope of work, and to [set up a meeting] with the Aftermath team in the coming days." [CC Compl. ¶ 75–76]. On the same day, Puls informed Aftermath that he would serve as the claims adjuster for the case. [Id. ¶ 77]. On August 6, "[d]uring [an] onsite inspection, . . . Gray stated to Aftermath's on-site team that Aftermath takes advantage of the elderly during a vulnerable time and that Aftermath is going to be sued by many carriers for its actions. . . . Gray also asked how much the Aftermath supervisor makes and suggested that Aftermath was overcharging its customers and underpaying the supervisor." [Id. ¶¶ 78–79].

Several days later, after not hearing anything, Aftermath reached out to Liberty Mutual; "Gray responded that they 'got the measurements and will be creating a comparative scope for the remaining work.'" [CC Compl. ¶¶ 80–82]. Several hours after that, Puls informed Aftermath that the customer had hired another company to complete the remaining work and that Aftermath could send their invoice for the initial work to him. [Id. ¶ 83]. The next day, Aftermath called the customer; "[t]he customer told Aftermath that the Liberty Mutual adjuster told them that Liberty Mutual does not like working with Aftermath and that Liberty Mutual will

not pay Aftermath's prices."  [Id. ¶ 84].  The customer also indicated that "they hired another

company to do the remediation work because Liberty Mutual did not give them the option to use

Aftermath."  [Id. ¶ 85].  Aftermath emailed an invoice for the initial work to Liberty Mutual and

the customer on August 19.  [Id. ¶ 86].

### B.   Discussion

#### 1.   Counterclaim I: Commercial Disparagement

> [I]n order to prevail on a claim alleging commercial disparagement, a plaintiff must
> prove that a defendant: (1) published a false statement to a person other than the
> plaintiff; (2) "of and concerning" the plaintiff's products or services; (3) with
> knowledge of the statement's falsity or with reckless disregard of its truth or falsity;
> (4) where pecuniary harm to the plaintiff's interests was intended or foreseeable;
> and (5) such publication resulted in special damages in the form of pecuniary loss.

HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 763 (Mass. 2013).  Liberty Mutual argues, see [ECF No.

55 at 4], that Aftermath and Employees have failed to allege that it made any statements "with

knowledge of the statement[s'] falsity or with reckless disregard of [their] truth or falsity,"

HipSaver, 984 N.E.2d at 768.  The SJC has held that this standard is equivalent to "actual

malice."  See id.

> Actual malice "is not measured by whether a reasonably prudent man would have
> published or would have investigated before publishing," but rather whether there
> is "sufficient evidence to permit the conclusion that the defendant in fact
> entertained serious doubts as to the truth of his publication."  Thus the "inquiry is
> a subjective one as to the defendant's attitude toward the truth or falsity of the
> statement."

Wofse v. Horn, 523 F. Supp. 3d 122, 134–35 (D. Mass. 2021) (quoting HipSaver, 984 N.E.2d at

755 & n.14).  "Because 'direct evidence of actual malice is rare,' it may be shown through

inference and circumstantial evidence."  Conformis, Inc. v. Aetna, Inc., 58 F.4th 517, 536 (1st

Cir. 2023) (quoting Sindi v. El-Moslimany, 896 F.3d 1, 16 (1st Cir. 2018)).  "By way of

example, actual malice 'may be found where a publisher fabricates an account, makes inherently

improbable allegations, relies on a source where there is an obvious reason to doubt its veracity,

or deliberately ignores evidence that calls into question his published statements.'"  Id.  "On a Rule 12(b)(6) motion to dismiss," the Court does not evaluate "evidentiary sufficiency," but "only whether [the plaintiff] laid out enough facts from which malice might reasonably be inferred.  Said otherwise, [plaintiff]'s well-pleaded facts must nudge [their] actual malice claim across the line from conceivable to plausible."  Lemelson v. Bloomberg L.P., 903 F.3d 19, 24 (1st Cir. 2018) (internal alterations, citations, and quotation marks omitted).

   Aftermath and Employees argue that the following allegations adequately plead knowledge or recklessness: (1) Liberty Mutual told customers that Aftermath sues property owners even though "Aftermath has not sued its customers and Liberty Mutual knows this"; (2) Liberty Mutual made these and other "false and disparaging" statements after customers signed contracts with Aftermath to "induce Aftermath's customers to break" those contracts; and (3) Liberty Mutual had "such an animus" towards Aftermath that Liberty Mutual encouraged a customer to "use a company that was not licensed to do the necessary hazardous work" instead of Aftermath and, when the customer declined to use that company, Liberty Mutual still insisted they not use Aftermath.  [ECF No. 62 at 8–9 (citations to CC Complaint omitted)].

   As to (1), the Counterclaim Complaint does not in fact allege that Liberty Mutual "knew" that Aftermath has not sued its customers.  Rather, Aftermath and Employees only make this point explicitly in their opposition, and, as support for this proposition, direct the Court to materials beyond the complaint:

> Liberty Mutual has made a similar claim [that Aftermath sues its customers] in this litigation but has not pointed to any actual evidence (e.g., a complaint or a court and docket number).  Indeed, Aftermath highlighted this lack of evidence and Liberty Mutual still did not come forward with any evidence to substantiate its assertion that Aftermath sues its customers.

[ECF No. 62 at 8 n.5].  "The fate of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four corners of the plaintiff's complaint," Young v. Lepone, 305 F.3d 1, 10–11 (1st Cir. 2002), and the Court does not find that any exceptions to that general rule apply here.  Appropriately focusing on the Counterclaim Complaint's allegations, the Court does not find that it can reasonably infer that Liberty Mutual "entertained serious doubts as to the truth of [its] publication," HipSaver, 984 N.E.2d at 768, or had any other animus towards Aftermath.  Liberty Mutual's motion to dismiss Counterclaim I is therefore GRANTED.[11]

### 2.    Counterclaim II: Tortious Interference with Business Relationships

> Under Massachusetts law, a plaintiff bringing a claim of tortious interference with
> a contractual relationship must prove that "(1) he had a contract with a third party;
> (2) the defendant knowingly interfered with that contract . . . ; (3) the defendant's
> interference, in addition to being intentional, was improper in motive or means; and
> (4)    the    plaintiff    was    harmed    by    the    defendant's    actions."

Hamann v. Carpenter, 937 F.3d 86, 90 (1st Cir. 2019) (quoting O'Donnell v. Boggs, 611 F.3d 50, 54 (1st Cir. 2010) (quoting Harrison v. NetCentric Corp., 744 N.E.2d 622, 632 (Mass. 2001))).  Liberty Mutual argues that Aftermath and Employees have failed to show that any alleged interference by Liberty Mutual "was improper in motive or means."  [ECF No. 55 at 9]. The Court agrees.  In this context, "improper conduct must extend 'beyond the interference itself.'"  inVentiv Health Consulting, Inc. v. Equitas Life Scis., 289 F. Supp. 3d 272, 283 (D. Mass. 2017) (quoting Cavicchi v. Koski, 855 N.E.2d 1137, 1142 (Mass. App. Ct. 2006)). "Violation of 'a statute or a rule of common law' or use of threats, misrepresentations of facts or 'other improper means' provides a sufficient improper motive or means."  Id. (quoting United

---

[11] Having found that dismissal is appropriate, the Court need not address Liberty Mutual's arguments that Aftermath and Employees fail to allege several other elements of commercial disparagement.  See [ECF No. 55 at 3-5].

Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 24 (Mass. 1990)).  The 'legitimate

advancement of [defendant's] own economic interest' does not constitute an improper motive."

Id. (quoting Pembroke Country Club, Inc. v. Regency Savings Bank, F.S.B., 815 N.E.2d 241,

246 (Mass. App. Ct. 2004)).  The Court can reasonably infer from the Counterclaim Complaint's

allegations that Liberty Mutual preferred its customers to use providers other than Aftermath and

may have even knowingly interfered with Aftermath's contracts with customers, but the Court

finds that Aftermath and Employees have failed to plausibly allege that Liberty Mutual did so

with any animus or other improper motive towards Aftermath, or by *knowingly* misstating any

facts or any other improper means.  See Desena v. Burns, 182 N.E.3d 340 (Mass. App. Ct. 2022)

(declining to find that defendant's complaints about plaintiff to a third party, with whom plaintiff

had an indirect business relationship, were "improper in motive or means," where plaintiff failed

to show complaints were false or that defendant knew they were false) (citing Cavicchi v. Koski,

855 N.E.2d 1137, 1142 (Mass. App. Ct. 2006) (other citation omitted)).  As such, Liberty

Mutual's motion to dismiss Counterclaim II is GRANTED.[12]

## V.      CONCLUSION

For the foregoing reasons, Defendants' partial motion to dismiss the First Amended

Complaint, [ECF No. 47], is GRANTED.  Plaintiff's cross-motion to amend, [ECF No. 50], is

DENIED; and Plaintiff's motion to dismiss Defendants' counterclaims, [ECF No. 54], is

GRANTED.  By September 13, 2023, Plaintiff shall either file a renewed motion to amend, with

a proposed amended complaint, or notify the Court that it will proceed with the surviving claims

---

[12] Having found that dismissal is appropriate, the Court need not address Liberty Mutual's
arguments that Aftermath and Employees fail to allege several other elements of tortious
interference with business relationships.  See [ECF No. 55 at 6–8].

of the operative complaint.  By the same date, Defendants shall either file a motion to amend,

with a proposed amended counterclaim complaint, or notify the Court that they will not do so.

**SO ORDERED.**

August 23, 2023                                                   /s/ Allison D. Burroughs
                                                                 ALLISON D. BURROUGHS
                                                                 U.S. DISTRICT JUDGE